UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                   :
                                           :
                                           :               **OPINION AND ORDER**
          - against -                      :
                                           :                  14 Cr. 83 (ER)
                                           :
WIGBERTO VIERA,                            :
   a/k/a "Roberto,"                        :
   a/k/a "Wiz,"                            :
LOUIE SANTIAGO,                            :
   a/k/a "Lionel,"                         :
   a/k/a "L,"                              :
   a/k/a "Leonel,"                         :
ERNESTO COLON,                             :
EDUARDO DEJESUS, and                       :
EVA FIGUEROA,                              :
                                           :
                        Defendants.        :
--------------------------------------------------------------x

Ramos, D.J.:

       On February 6, 2014, a grand jury returned an indictment charging Wigberto Viera, a/k/a

"Roberto," a/k/a "Wiz," Louie Santiago, a/k/a "Lionel," a/k/a "L," a/k/a "Leonel," Ernesto

Colon, Eduardo Dejesus, and Eva Figueroa with conspiracy to distribute narcotics, and

conspiracy to commit Hobbs Act robbery.  Viera, Colon, Dejesus, and Figueroa were also

charged with possession of a firearm during the charged conspiracies, and Santiago with

brandishing a firearm during the charged conspiracies.  The charges arose from a sting operation

conducted by the Drug Enforcement Administration ("DEA"), which culminated in the

defendants' arrest on January 8, 2014.

The defendants[1] have moved to dismiss the indictment, arguing that the sting operation constituted outrageous government conduct in violation of their Fifth Amendment due process rights.[2]  Defendant Viera has separately moved to dismiss the indictment on subject matter jurisdiction grounds.[3]  In the alternative, the defendants seek the immediate disclosure of *Giglio* and Jencks Act material.

For the reasons discussed below, the defendants' motions are DENIED.

## I.  BACKGROUND

In October 2013, a cooperating witness ("CW") provided information to the DEA regarding Viera.  Compl. ¶ 9.  According to the CW, Viera had previously indicated that he had a crew that had conducted robberies of drug dealers in the past and that was capable of committing such robberies in the future.  *Id.*  Viera asked the CW to inform him of any potential targets for a robbery or home invasion.  *Id.*

In October and November 2013, at the direction of law enforcement, the CW made several recorded telephone calls to Viera in which the CW informed him of a potential opportunity for a robbery, and they agreed to meet in person at a parking lot in upper Manhattan (the "Parking Lot") to further discuss the planned robbery.  *Id.* ¶ 10.

On November 15, 2013, Viera met with the CW at the Parking Lot.  *Id.* ¶ 11.  Viera brought Santiago to the meeting.  *Id.*  The CW told Viera and Santiago that a person he knew had

---

[1] On May 20, 2014, Eduardo Dejesus pleaded guilty to the Hobbs Act conspiracy and firearms possession charges. *See* Minute Entry, dated May 20, 2014.

[2] On October 14, 2014, Defendant Viera moved to dismiss the indictment and compel the disclosure of *Giglio* material.  Doc. 48.  Defendants Santiago and Figueroa join in Mr. Viera's motion.  Doc. 57, 63.

On October 17, 2014, Defendant Colon moved to dismiss the indictment.  Doc. 58.  Defendant Figueroa joins in Mr. Colon's motion.  Doc. 63.

[3] Viera filed the supplemental motion to dismiss, without the assistance of counsel, on November 12, 2014.  Doc. 65.  By letter dated December 29, 2014, counsel endorsed Mr. Viera's supplemental motion.  Doc. 73.

inside information on drug dealers who would be moving a large shipment of cocaine and heroin from Miami to New York. *Id.* ¶ 11(a). Viera and Santiago expressed interest in robbing the drug dealers with their "crew." *Id.* Viera and Santiago informed the CW that if any of the intended targets made any sudden movements during the robbery, they would "deal with them." *Id.* ¶ 11(b). The CW understood that statement to mean that Viera and Santiago would shoot or kill the intended targets if they resisted the robbery. *Id.* Viera and Santiago also explained to the CW that they could sell the CW's share of the stolen drugs for him. *Id.*

On December 21, 2013, at the direction of law enforcement, the CW made a recorded telephone call to Viera in which Viera indicated his continued willingness to do the robbery, and they arranged to have another in-person meeting. *Id.* ¶ 12. On January 1, 2014, Viera and Santiago met in the Parking Lot with the CW and a confidential source who was posing as the person with inside information on the drug dealers ("CS"). *Id.* ¶ 13. At the meeting, the CW and the CS informed Viera and Santiago that the drug dealers would be transporting 22 kilograms of cocaine and six kilograms of heroin and that they should be prepared to commit the robbery on January 8, 2014. *Id.* ¶ 13(a). Viera and Santiago advised the CW and the CS that they were ready to proceed with the robbery, and reiterated that they were prepared to shoot the intended targets of the robbery if they resisted. *Id.* ¶¶ 13(b), 13(c).

During the first week of January 2014, the CW had several telephone conversations with Viera and Santiago, confirming their readiness to proceed with the robbery on January 8, 2014. *Id.* ¶ 14. In the early afternoon on January 8, 2014, law enforcement units observed Viera, Santiago, Colon, Dejesus, and Figueroa in Camden, New Jersey, inside of a rented silver 2013 GMC Terrain with South Carolina license plates (the "Vehicle"). *Id.* ¶ 15(a). When the Vehicle

arrived in New York City, Viera called the CW, who instructed them to meet in the Parking Lot. *Id.* ¶¶ 15(c), 15(d).

At approximately 6:15 p.m., the CW pulled into the Parking Lot and met with Viera and Santiago. *Id.* ¶ 15(e). The CW could see other people in the Vehicle. *Id.* The CW explained to Viera and Santiago that the robbery was still scheduled to occur, and Viera and Santiago confirmed that they were ready to proceed. *Id.* The CW instructed them to wait at a motel room that he had rented in Manhattan while he went to pick up the CS. *Id.*

At approximately 8:30 p.m., the CW telephoned Viera and informed him that he had picked up the CS and that they should all meet again at the Parking Lot. *Id.* ¶ 15(g). At approximately 8:50 p.m., the Vehicle was observed entering the Parking Lot, at which time Viera exited the Vehicle and met with the CW and the CS. *Id.* ¶ 15(h). The CW told Viera that the drug dealers would be armed, and Viera said that the CW should not worry because they had some "big shit" for them, which the CW understood to mean high caliber weapons. *Id.* Viera informed the CW that the CW and the CS's share of the drugs would be 10 kilograms of cocaine and one kilogram of heroin, and that the balance would be split among his crew. *Id.* ¶ 15(i). Viera also told the CW and the CS that all of the individuals in the Vehicle would be participating in the robbery. *Id.* The CW and the CS entered their car as the Vehicle pulled behind them, driving in tandem to the target location at West 132nd Street and 12th Avenue. *Id.* ¶ 15(j).

When the cars arrived at that location, law enforcement conducted a traffic stop of the Vehicle. *Id.* ¶ 16. As officers approached the Vehicle yelling "Police!" and wearing tactical raid

jackets marked "Police," Santiago exited the Vehicle and pointed a handgun at the officers.  *Id.* ¶ 16(b).[4]  Santiago was subsequently shot by one of the officers in the arm.  *Id.*[5]

The officers arrested the defendants and conducted a search of the Vehicle.  *Id.* ¶ 16(c). They recovered the handgun that had been brandished by Santiago between the console and the driver's seat, a two-way radio in the front passenger door cup holder, and black ski masks under the passenger seat and in the glove compartment.  *Id.* ¶ 16(d).  The officers recovered a black guitar bag from the trunk which contained "zip ties," a pump action Mossberg Shotgun with a pistol grip, and an AK-47 assault rifle with a collapsible stock.  *Id.* ¶ 16(e).  In addition, Figueroa was in possession of black tactical gloves and a folding knife; Colon was in possession of a ski mask and black tactical gloves; and Viera was in possession of a black ski mask.  *Id.* ¶¶ 16(f)-(h).

On February 6, 2014, a grand jury returned an indictment which charged all of the defendants with one count of conspiracy to distribute narcotics in violation of 21 U.S.C. ¶ 846, and one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. ¶ 1951. Viera, Colon, Dejesus, and Figueroa were additionally charged with possession of a firearm in connection with the charged conspiracies.  Santiago was additionally charged with brandishing a firearm in connection with the charged conspiracies.

## II.  DEFENDANTS' MOTIONS

This is but the latest in a series of challenges filed by defendants indicted in this District on drug-related charges involving reverse stings.[6]  These challenges are based on two recent cases out of the Central District of California, where the district court found that the

---

[4] The defendants claim that Santiago "vigorously contests that he brandished a handgun."  Viera Mem. L. 7.

[5] Santiago was treated and released from the hospital into police custody on the same night.  Compl. ¶ 16(b).

[6] *See, e.g.*, *United States v. Gomez*, No. 14 Cr. 459 (SAS) (S.D.N.Y. Dec. 2, 2014); *United States v. Davis*, --- F.3d ----, No.13 Cr. 986 (LTS), 2014 WL 5758199, at *1 (S.D.N.Y. Nov. 5, 2014); *United States v. Borrero*, No. 13 Cr. 58 (KBF), 2014 WL 5493241, at *1 (S.D.N.Y. Oct. 30, 2014).

government's efforts at recruiting poor men of color to engage in the robberies constituted outrageous government conduct. Each of these challenges has been denied by the judges of this Court. This one must be denied as well.

*a. Due Process*

The Fifth Amendment to the Constitution of the United States provides that: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In *Hampton v. United States*, 425 U.S. 484, 493-94 (1976), the Supreme Court recognized the possibility that government involvement in a crime might become so "outrageous" that it violates the Fifth Amendment due process rights of a defendant. *See also United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (stating that government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped). Unlike entrapment, which focuses on the defendant's predisposition, outrageous government conduct focuses on the conduct of the government agents. *Id.* (citing *United States v. Myers*, 692 F.2d 823, 836 (2d Cir. 1982)).

To establish a due process violation on this ground, "a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" *Id.* (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)). "Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." *Id.* "The [defendants'] burden is a heavy one because courts are required to be deferential to the Government's 'choice of investigatory methods.'" *Davis*, 2014 WL 5758199, at *3.

The defendants claim that the government's conduct here was outrageous because the DEA "manufactured" the crime.  Viera Mem. L. 13.  They contend that without the government's involvement, they would not have had the intention, proficiency, or ability to commit the charged crimes.  *Id.* at 14.  These allegations do not make out a due process violation.  It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is excessive.  *Al Kassar*, 660 F.3d at 121 (internal citations omitted); *Myers*, 692 F.2d at 837 (stating that the creation of an opportunity for the commission of crime by those willing to do so does not violate due process).  "Therefore, even a sting operation that involves 'government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits.'"  *Davis*, 2014 WL 5758199, at *3 (quoting *United States v. Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013), *cert. denied*, 135 S. Ct. 53 (2014)).

The defendants' papers suggest that to properly assess the government's conduct, we need to look beyond the facts of this case because it is only part of a pattern of government wrongdoing.  Specifically, they allege that this is one of several nearly identical cases brought in this District over the last two years involving the same DEA special agents and cooperating witnesses.  Viera Mem. L. 4.[7]  In these cases, federal law enforcement targeted potential defendants in New Jersey, Pennsylvania, and elsewhere, and arranged for them to rob purported drug dealers transporting large quantities of drugs.  *Id.* at 5.  The defendants claim that the cooperating witnesses "simply trolled impoverished neighborhoods, targeting Afro-Americans

---

[7] The government acknowledges that the instant investigation "was one of a number conducted in the past eighteen months" by the same DEA unit, many of which involved the same agents and the use of one or more of a number of confidential sources and cooperating witnesses.  Govt. Mem. L. 3.  As of the filing of the government's opposition to the instant motion, the investigations had resulted in over 80 arrests and 16 different criminal prosecutions.  *Id.*

and Hispanics and attempted to feed those individuals into an apparatus designed by the government to manufacture convictions." *Id.* at 5-6.

This challenge is premised on two Central District of California decisions issued last year involving "stash house" reverse stings. *United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014), *rev'd*, *United States v. Dunlap*, Nos. 14-50129, 14-50285, --- F. App'x ----, 2014 WL 6807733, at *1 (9th Cir. Dec. 4, 2014); *United States v. Roberts*, No. CR 13-00751-R-2, 3, 5 (C.D. Cal. May 30, 2014).[8]  For several reasons, these cases do not compel the dismissal of the indictment here.  Most notably, *Hudson* is no longer good law.  In *Dunlap*, the Ninth Circuit promptly reversed the district court's dismissal in *Hudson* and found that the government's conduct did not meet the "extremely high standard" required for dismissal under the due process clause.  2014 WL 6807733, at *1.  In particular, the court highlighted the fact that—as is the case here—the ATF targeted individuals who had already demonstrated an interest in committing robberies and "did little more than set the bait" by inventing a fictitious stash house they could rob.  *Id.* (internal quotation marks and citation omitted).  And in *Dunlap*—as here—"[o]nce the bait was set, Defendants responded with enthusiasm" by planning nearly every detail of the

---

[8] In *Hudson*, the district court granted dismissal of an indictment based on an Alcohol, Tobacco, Firearms, and Explosives ("ATF") reverse sting operation involving an imaginary stash house.  3 F. Supp. 3d at 775.  In that case, one of the defendants had asked a confidential informant ("CI") whether he knew of any robbery opportunities.  *Id.* at 775-76.  After subsequent monitored meetings and telephone communications, the defendant, two co-conspirators, and the CI met with an undercover agent at a warehouse.  *Id.* at 777.  The defendant was arrested there some time after he placed a bag containing a shotgun and revolver into the purported getaway vehicle.  *Id.*  Based on, *inter alia*, the fact that the defendants never indicated to the ATF that they had previously engaged in home invasions or drug stash-house robberies, and the ATF's "dangling over $600,000 in front of clearly impoverished individuals," the court found the government's conduct unconstitutional.  *Id.* at 777, 783.

In *Roberts*, the district court dismissed an indictment arising out of a similar ATF reverse sting operation also on due process grounds.  No. CR 13-00751-R-2, 3, 5 (C.D. Cal. May 30, 2014).  There, the ATF used paid confidential informants to recruit the defendant—who was known to have spent time in prison, but not for drug offenses—and used him to recruit three other defendants.  *Id.*  The defendants were all arrested after arriving at a warehouse with guns, per the ATF's instructions.  *Id.*  As in *Hudson*, the court in *Roberts* was critical of the government's targeting of "minorities in poor neighborhoods with huge payouts in the hundreds of thousands of dollars," and observed that the government "had no reason to suspect any of these defendants before targeting them to join its fictitious scheme."  *Id.*

robbery without assistance, including, *inter alia*, how many men they would bring and what weapons and other equipment they would use.  *Id.*

Secondly, as recognized in *Borrero* and *Gomez*, *Hudson* applied a Ninth Circuit totality-of-the-circumstances standard that has never been adopted in the Second Circuit.  *See Borrero*, 2014 WL 5493241, at *4 (observing that the government's conduct in stash house sting operation was "not 'outrageous' even under *Hudson*'s analysis" based on the robbery crew's participation in an ongoing criminal enterprise); *United States v. Gomez*, No. 14 Cr. 459 (SAS) (S.D.N.Y. Dec. 2, 2014) (noting that the defendant's reliance on *Hudson* was misplaced because of the Ninth Circuit's totality-of-the-circumstances test, which includes such factors as the government's role in creating the crime of conviction and the government's encouragement of the defendants to commit the offense conduct).  And finally, in the Ninth Circuit, the government has the burden of disproving the outrageousness of its conduct in reverse sting cases.  *See United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 267 (2014).  That is not the standard in this Circuit.  *Cf. Davis*, 2014 WL 5758199, at *3.  For these reasons, the Ninth Circuit offers no support for the defendants' motion.[9]

Not surprisingly, therefore, this court has denied each motion seeking dismissal of indictments based on the two decisions of the Central District of California.  In *Davis*, for

---

[9] The defendants' reliance on decades-old Third Circuit precedent is similarly unavailing.  *See* Viera Mem. L. 13.  In *United States v. Twigg*, 588 F.2d 373, 375 (3d Cir. 1978), the court affirmed dismissal of an indictment based on a sting involving the operation of a methamphetamine laboratory.  There, the defendants were incapable of operating the facility without the active intervention and supervision of a government informant.  *Id.*  And while the informant was completely in charge of the laboratory, the defendants ran errands for groceries or coffee or spent time away from the facility altogether.  *Id.* at 376.  Accordingly, *Twigg* is wholly distinguishable because, as this court has previously recognized, the government in that case not only concocted the drug crime but also provided the defendants with the means to accomplish it.  *See United States v. Coke*, No. 07 Cr. 971 (RPP), 2011 WL 3738969, at *5 n.6 (S.D.N.Y. Aug. 22, 2011).  Moreover, the Third Circuit itself has previously distinguished *Twigg* to deny dismissal where the defendants were predisposed to commit the crime in question and relied on their own experience to benefit the illegal scheme.  *See United States v. Lakhani*, 480 F.3d 171, 182 (3d Cir. 2007); *see also United States v. Nolan-Cooper*, 155 F.3d 221, 234 n.8 (3d Cir. 1998) (stating that unlike *Twigg*, this is not a case where law enforcement created new crimes "solely for the sake of bringing charges against a suspect who was lawfully minding her own affairs").

example, the court rejected the defendants' argument that the government's conduct—which was virtually identical to that here—was outrageous.  2014 WL 5758199, at *3.  The court found that the defendants did not allege any facts indicative of coercion, intimidation, or physical force by the government.  *Id.*  And in *United States v. Cook*, No. 13 Cr. 777 (AJN) (S.D.N.Y. Mar. 10, 2014), the court concluded that the defendants' objections to the fact that the sting operation involved fictitious drug dealers and drugs did not meet the very heavy burden for establishing outrageous government conduct.  *Id.*  The court noted that the sting "amounted to nothing more and nothing less than . . . [a] constitutionally permissible effort to present Defendants 'the opportunity to commit the offense' . . . ."  *Id.* (quoting *Al Kassar*, 660 F.3d at 121).

The defendants attempt to distinguish the instant case from *Davis* and *Cook* based on the assertion that the agents shot Santiago and shot at Viera.  Viera Mem. L. 7.  According to the defendants, it was an inevitable consequence of the sting operation that the safety of third parties would be jeopardized.  *Id.*  However, as recognized by the court in *Davis*, even though such robberies may pose a risk of such potential injury, targeting those intent on carrying out such an offense and who have the capacity to do so is not outrageous government conduct that would warrant the dismissal of an indictment.  *Davis*, 2014 WL 5758199, at *4.

Accordingly, the defendants' motion to dismiss the indictment on the grounds of outrageous government conduct is DENIED.

b.  *Subject Matter Jurisdiction*

Defendant Viera moves separately to dismiss the indictment on subject matter jurisdiction grounds.  Viera argues that the narcotics conspiracy charge is deficient because there was no agreement to distribute or possess with the intent to distribute the heroin, and there is no evidence that anyone other than Viera himself intended to distribute the drugs targeted in the

robbery.  Viera Supp. Mem. L. 4, 5.  Mr. Viera also challenges the Hobbs Act robbery conspiracy charge based on the claim that no one has the right to possess an illegal drug, and therefore the robbery conspiracy did not involve the deprivation of a property right.  *Id.* at 10, 11.

The indictment is sufficient on its face as a matter of law.  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  To state an offense, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotations omitted).  Accordingly, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.  *Id.* at 777; *see also United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995) ("A defendant is only entitled to raise in pretrial motions a 'defense, objection, or request which is capable of determination without the trial of the general issue.'  The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged." (quoting Fed. R. Crim. P. 12(b)).

As the government correctly notes, Viera's challenges to the indictment are improperly addressed to the sufficiency of the evidence.  Govt. Supp. Mem. L. 11.  The indictment tracks the statutory language of both the conspiracy statute and the substantive narcotics and robbery statutes that the defendants allegedly agreed to violate.  *See* 21 U.S.C. §§ 841, 846; 18 U.S.C. § 1951.  The indictment also alleges the approximate time and place of each conspiracy.  The

indictment therefore states an offense and is sufficiently specific to permit the defendants to prepare their defense and to bar future prosecutions for the same offense.[10]

Defendant Viera's supplemental motion to dismiss the indictment for lack of subject matter jurisdiction is therefore DENIED.

    *c.   Immediate Disclosure of Giglio and Jencks Act Material*

In the alternative, the defendants seek to compel the immediate disclosure of all "*Brady* impeachment material" in order to "allow [the defendants] to make effective use of [such material] at trial."  Viera Mem. L. 19.  The government has indicated its intention to produce (i) a witness list—including the names of both the CW and the CS—along with any impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), one week before trial, and (ii) Jencks Act material for all witnesses on the Friday before trial.  Govt. Mem. L. 23.

As a general rule, *Brady* and its progeny do not require *immediate* disclosure of all exculpatory and impeachment material upon request by a defendant.  *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  In *Coppa*, the Second Circuit observed that the law appears settled as to when the prosecution must make a disclosure required by *Brady*:  "*Brady* material must be disclosed in time for its effective use at trial."  *Id.* at 144.  Courts do, however, have some "discretion to order pretrial disclosures as a matter of sound case management."  *Id.* at 146.

The Court finds that the government's proposed schedule comports with the defendants' due process rights.  *Cf. Davis*, 2014 WL 5758199, at *5 (concluding that the government's planned disclosure of *Giglio* material—including the identities of the cooperating witness and cooperating source—one week before trial, and Jencks Act material on the Friday before trial to

---

[10] The government is, of course, correct that Viera's argument that a conspiracy to rob someone of narcotics cannot constitute a Hobbs Act conspiracy is without legal basis.  *See, e.g.*, *United States v. Needham*, 604 F.3d 673, 680 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 355 (2010) (noting that a conspiracy that targets cocaine and heroin, and the proceeds from their sale, undoubtedly meets the jurisdictional element for Hobbs Act conspiracy).

be reasonable); *United States v. Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at

*11 (S.D.N.Y. Aug. 16, 2012) (approving government's planned disclosure of *Giglio* and Jencks

Act material one week before trial in narcotics conspiracy and money laundering case); *United*

*States v. Badoolah*, No. 12 Cr. 774 (KAM), 2014 WL 4793787, at *16 (E.D.N.Y. Sept. 25, 2014)

(stating that there was no reason to deviate from the government's standard practice of producing

*Giglio* material and Jencks Act material one week before trial).  Accordingly, the defendants'

motion to compel the immediate disclosure of *Giglio* and Jencks Act material is DENIED.

## III. CONCLUSION

For the reasons set forth above, the defendants' motions are denied in their entirety.  The

Clerk of the Court is respectfully directed to terminate the motions (Docs. 48, 58, 65).

It is SO ORDERED.

Dated:     January 14, 2015
           New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.