UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | ATTORNEY DECLARATION |
| - v. - | 14 Cr. 083 (ER) |
| WIGBERTO VIERA, LOUIE SANTIAGO, and ERNESTO COLON, | |
| DEFENDANTS. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, John A. Diaz, Esq., hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am a partner at the law firm DIAZ & MOSKOWITZ, PLLC., and that I have been assigned to represent defendant Ernesto Colon pursuant to the provisions of the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.

2. I make this declaration in support of a motion on behalf of defendant Ernesto Colon and Wigberto Viera, pursuant to the Fifth Amendment and Local Criminal Rule 16.1, to compel the Government to produce certain discovery items necessary for the subsequent filing of a pretrial motion attacking the indictment on the grounds of, *inter alia*, selective enforcement and/or selective prosecution.

3. This case is currently scheduled for trial on July 20, 2015. Pursuant to Rule 12(3)(A)(iv) of the Federal Rules of Criminal Procedure, a motion for selective prosecution must be brought before trial and, as a result, the defendant is compelled to bring this motion at the instant time.

4. The statements contained in this declaration are based upon information and belief, my review of court documents and other evidence, conversations with defense counsel on companion cases, evidence in similar cases in this district, and publicly available demographic data. Furthermore, on March 16, 2015, the Federal Defenders of New York, by way of Jonathan Marvinny, Esq., filed a motion for the same relief on a companion case, *United States v. Nakai Lamar*, 14 Cr. 726 (PGG). Counsel has

incorporated the statistics and other relevant evidence used by the Federal Defenders in the instant motion. Mr. Marvinny also provided counsel with transcripts and factual information regarding companion cases involving his office.

**The charges**

The defendants are indicted on three counts: (1) conspiracy to possess and distribute heroin and cocaine, 21 U.S.C. §§ 846, 841(b)(1)(A); (2) conspiracy to commit robbery, 18 U.S.C. § 1951; and (3) possession of a firearm during a crime of violence and drug trafficking offense, 18 U.S.C. §§ 924(c)(1)(A)(i), 2. Defendant Santiago is solely charged with a fourth court under 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2, brandishing of a firearm in furtherance of the charged crimes.

5. The charges stem from a reverse sting engineered by the Drug Enforcement Agency (DEA) case agent, Todd C. Riley, who fabricated the existence of a plot wherein imaginary drug dealers planned to travel by car from Miami to New York City transporting an imaginary multi-kilogram drug shipment. The defendants allegedly agreed to rob these drug dealers at gunpoint. *See* Exhibit A.

6. According to the complaint, in or around October 2013, a confidential witness ("the CW") told agent Riley and other DEA agents that defendant Wigberto Viera (who is from Camden, New Jersey) indicated a willingness to commit robberies of drug dealers. *Id.* at ¶ 9. Over the next several weeks, the CW engaged Viera in a series of conversations discussing the possibility of Viera, along with others, robbing drug dealers traveling from Miami to New York City by car with a large quantity of narcotics. *Id.* at ¶¶ 9–12.

7. The complaint alleges that, on or about January 1, 2014, defendant Viera and co-defendant Santiago (also from Camden, New Jersey) met the CW in a parking lot in upper Manhattan and discussed the specifics of the robbery. The CW informed them that the vehicle driven by the drug dealers contained 22 kilograms of cocaine and 6 kilograms of heroin. *Id* at ¶ 11(a). Viera and Santiago allegedly stated that they were considering hiring another crew to help execute the robbery and were prepared to shoot the targets if met with resistance. *Id* at ¶ 13(c).

8. According to the complaint, on January 8, 2014, the CW explained to Viera and Santiago that the robbery was still scheduled to take place and that he rented a hotel room in Manhattan where they would meet to divide the proceeds from the robbery. *Id*. at ¶ 15(e). Later that evening, the CW established where the fictitious robbery was to occur by leading the defendants, who were driving in a separate car, to a predetermined location. Upon arrival at the location, DEA agents opened fire on the defendants' vehicle striking defendant Santiago. The complaint alleges that Santiago exited the vehicle and pointed a handgun at the agents, however, the complaint later states that said handgun was inexplicably recovered between the center console and the driver's seat of the vehicle. *Id*. at ¶ 16(a)-(d). Law enforcement further recovered an AK-47 assault rifle and shotgun from the trunk of the vehicle. *Id*. at ¶ 16(e).

**Compliance with Local Criminal Rule 16.1**

9. On March 18, 2015, counsel for defendant Wigberto Viera, James M. Roth Esq., on behalf of his client and my client Ernesto Colon, sent the Government a letter requesting the items listed below without requiring the Court's intervention. *See* Defendants' Discovery Request Letter (Exhibit B).

- A list of all reverse-sting cases—and the race of each defendant charged in those cases—involving alleged Hobbs Act robberies of supposedly large narcotics stashes ("phony-stash cases") brought by the United States Attorney's Office for the Southern District of New York ("the USAO"), where the DEA was the federal investigating agency, during the last 10 years;

- For each "phony-stash case," a statement of the prior criminal investigations, if any, the DEA conducted into each defendant before initiating the reverse sting;

- All national and New York Divisions of the DEA manuals, circulars, field notes, correspondence, or, any other material which discusses "stings," "reverse stings," "phony-stash ripoffs," or, entrapment operations, including protocols and/or directions to agents and confidential informants regarding the method of conducting such operations, how to determine which persons to pursue as potential targets or ultimate defendants, whether an attempt to disengage by a prospective co-conspirator is timely and whether that prospective co-conspirator can be or should be dissuaded from disengaging, and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin;

- All documents containing information on how supervisors and managers of the New York DEA were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, color, ancestry, or national origin for these "phony-stash cases," and

what actions those supervisors and managers took to determine whether agents were in fact targeting persons for those reasons;

- The number of confidential informants that the New York DEA has used in "phony-stash cases" each year during the last 10 years and the number of those confidential informants that had access to non-African-American or non-Hispanic persons who could be targeted for a "phony-stash case";

- Discovery from and other information pertaining to "phony-stash cases" where the USAO or the New York DEA targeted non-African American or non-Hispanic persons;

- All documents that contain information about actions taken during the last 10 years by the USAO to ensure that defendants in "phony-stash cases" brought by the USAO had not been targeted due to their race, color, ancestry, or national origin.

10. On March 19, 2015, the Government responded by letter stating that it would not provide any of the requested items and would oppose any motion to compel them. *See* Government's Response Letter (Exhibit C).

[Rule 12(3)(A)(iv) – motion for selective prosecution and/or selective enforcement]

11. The minimal factual basis necessary to justify the assertion of a selective prosecution and/or selective enforcement claim currently exists.

12. Nationwide, evidence-based criticism concerning the possibility of racial profiling in "phony-stash cases" is well documented and publicized. Even a simple analysis of the "phony-stash cases" filed in the Southern District of New York lends credence to this proposition.

<u>Nationwide criticism of "phony-stash cases"</u>

13. Federal law enforcement's use of reverse stings to target defendants for "phony-stash cases" has come under widespread criticism. An investigation by USA Today found that over 91% of the defendants convicted in such cases are people of color. *See* Brad Heath, *Investigation: ATF Drug Stings Targeted Minorities*, USA Today, July 20, 2014, http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-

4

profiling/12800195/. Recently, federal prosecutors in Chicago elected to dismiss drug-conspiracy charges against 27 defendants in "phony-stash cases" presumably because such cases have been "highly criticized for targeting mostly minority suspects, many of whom were drawn into the bogus rip-offs by informants who promised easy money at vulnerable points in their lives." Annie Sweeney & Jason Meisner, *Chicago Prosecutors Quietly Drop Charges Tied to Drug Stash House Stings*, Chi. Trib., Jan. 29, 2015, http://www.chicagotribune.com/news/local/breaking/ct-stash-houses-charges-dropped-met-20150129-story.html#page=1. Indeed, the New York Times describes these cases as having "spurred a national debate over possible entrapment and racial profiling." Erick Eckholm, *Prosecutor Drops Toughest Charges in Chicago Stings That Used Fake Drugs*, N.Y. Times, Jan. 31, 2015, http://www.nytimes.com/2015/01/31/us/toughest-charges-dropped-in-chicago-drug-stings.html.

### An overview of "phony-stash cases" in this district

14. The alleged fact pattern in this case is nearly identical to numerous other "phony-stash cases" prosecuted in this district since 2013. The defendants are aware of 18 such cases, including this one. The complaints from these 18 cases are attached in chronological order as Exhibit D. The DEA is the investigating agency in all 18 cases and Agent Riley is listed as the case agent on all but three of them.[1]

15. The fact patterns alleged in the 18 complaints are remarkably similar. Each involves a cooperating witness who targets an individual on the basis that either the CW allegedly witnessed the individual participate in previous robberies, or, the CW allegedly heard the individual boast of participation in prior robberies. The CW then approaches the individual and proposes a robbery almost too good to be true: a

---

[1] It is unclear what role, if any, Agent Riley played in the cases where he is not listed as the case agent. It should be noted that the Government recently dismissed all charges against Zykia Speller—a defendant in *United States v. Tyrone Davis et al.*— on the eve of trial, after material turned over by the Government pursuant to 18 U.S.C. § 3500, revealed that Agent Riley made material misrepresentation during his grand jury testimony. *See* Nolle Prosequi Order, *United States v. Zykia Speller*, 13 Cr. 986 (LTS) (S.D.N.Y. Jan. 16, 2015), ECF No. 146. Specifically, I was informed by counsel for Zykia Speller that Agent Riley falsely testified that Ms. Speller had attended a meeting with a confidential informant and that she was present at the scene of the (imaginary) robbery, but, in fact, she was not.

massive, often poorly guarded cache of narcotics usually located either in a stash house or in a car traveling to New York City from out of state. The individual is urged to recruit future co-defendants to participate in the imaginary robbery and prepare for the robbery by securing loaded firearms. So armed, the defendants travel in vehicles to the scene of the imaginary robbery, which is always in Manhattan or the Bronx, and then placed under immediate arrest. All the defendants, with few exceptions, are subsequently charged with a (b)(1)(A) narcotics conspiracy, a Hobbs Act robbery conspiracy, and § 924(c) firearm possession. Under the (b)(1)(A) narcotics conspiracy and the 924(c) charges alone, the defendants face a mandatory minimum of 15 years.

16. There are a total of 95 defendants in the 18 "phony-stash cases" of which the defendants are aware.[2]

17. Federal Defenders of New York informed counsel that all 95 defendants in the 18 cases are people of color. Not a single defendant is white (nonhispanic).

### Race-specific references in DEA recordings

18. In at least one "phony-stash case" in this district—the Johnny Terry case,[3] whose complaint is included at Exhibit D—the DEA's confidential informant made explicit and frequent references, which were recorded, to the desirability of recruiting black defendants for the (imaginary) robberies of narcotics stashes.[4]

19. In that case, the CI approached Terry and asked him if he wanted to make some money by assisting the CI in stealing drugs and money. The CI told Terry that a car containing drugs and money was due to

---

[2] The 18 complaints list 91 total defendants. In one case (*United States v. Javion Camacho et al.*), however, four additional defendants were added to the case at the indictment stage, bringing the total number of defendants in the "phony-stash cases" to 95.

[3] 13 Mag. 220. Terry was the lead defendant and represented by Federal Defenders of New York. The transcripts were provided to counsel by Jonathan Marvinny of the Federal Defenders.

[4] At this point, the defendants are unaware of whether the DEA used the CI from the Terry case in other "phony-stash cases." Of course, some discovery items the defendants seek pertain to information regarding the total number of CIs used by the DEA and the cases in which each CI participated.

arrive from Virginia on January 24, 2013. The CI then explained that Terry's codefendants, Maurice Baptiste and Alfredo Rodriguez, were to steal the car after the CI's friend asked one of the passengers to get out of the car.

20. The CI—who was Hispanic—explicitly told Terry that black participants were necessary to ensure the plan went smoothly. The CI explained that the "inside job" would fool the victims into never suspecting the CI's involvement, since the victims would never expect the CI to be involved with "black people" and Terry and his companions were black. According to the CI, he "would have nothing to do with it. [He doesn't] know no black people." Draft Transcript of January 16, 2013, Meeting, at 23 (Exhibit E).

21. Indeed, the CI emphasized at his first recorded meeting with Terry that Terry was the ideal co-conspirator because of the color of his skin. He said, "Yo, this guy is black, he's perfect." *Id.* at 6; *see also id.* at 5 ("And you black, you know what I'm saying? It gonna look good."). At that same meeting, the CI noted that he believed committing the crime with Terry would be easier because Terry was black. *Id.* at 9 ("When you told me the first time I thought about it, like, damn I can't do this. And then I went, but this nigga's black."). Moreover, when instructing Terry to recruit other individuals to participate in the crime, the CI made sure to confirm that "them niggas is dark-skinned, those other niggas?" *Id.* at 10.

22. The CI's reliance on race continued throughout his interactions with Terry. At a meeting on January 23, 2013, the CI explained to Terry that he told the driver who would be participating in the crime, "Yo, I got some black dudes from the Bronx, they say they get down, they do it. So we was like, oh, that's beautiful." Draft Transcript of January 23, 2013, Meeting at 1 (Exhibit F). The CI also reiterated that a black person was the perfect co-conspirator when he said, "[w]ell, this is gonna be just like to test you, you know what I'm sayin? ... And you black." *Id.* at 9.

**The racial composition of Manhattan, the Bronx, and the Southern District of New York**

23. As of the 2010 census, Manhattan and the Bronx, collectively, had 2,970,981 residents. *See* New York City 2010 Census Data, available at http://www.nyc.gov/

7

html/dcp/pdf/census/census2010/t_pl_p2a_nyc.pdf. Of those residents, 30.7% (912,702) were white (nonhispanic); 20.9% (622,035) were black (nonhispanic); and 38.5% (1,144,990) were Hispanic. *Id.* The following chart provides the pertinent racial breakdown for the two counties.

| County | Total residents | White (nonhispanic) | Black (nonhispanic) | Hispanic origin |
|---|---|---|---|---|
| Manhattan | 1,585,873 | 761,493 (48.0%) | 205,340 (12.9%) | 403,577 (25.4%) |
| Bronx | 1,385,108 | 151,209 (10.9%) | 416,695 (30.1%) | 741,413 (53.5%) |

24. The entire Southern District of New York—which includes the additional counties of Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan—has an even greater overall percentage of white residents than Manhattan and the Bronx, as each of those additional counties has a significantly higher percentage of white (nonhispanic) residents. Westchester is 55.7% white (nonhispanic); Orange is 57.2% white (nonhispanic); Rockland is 63.9% white (nonhispanic); Dutchess is 73.3% white (nonhispanic); Sullivan is 73.7% white (nonhispanic); and Putnam is 81.5% white (nonhispanic). *See* New York State Estimated 2013 Census Data, available at http://quickfacts.census.gov/qfd/states/36000.html (select an individual county from the drop-down menu).

### Sentencing Commission data on the races of robbery offenders in the Southern District of New York

25. The United States Sentencing Commission maintains data about the races of offenders in federal criminal cases by district and by specific Sentencing Guideline. This data indicates that, in the Southern District of New York during the fiscal years, 2006–2012, offenders convicted under the Robbery

Guideline (§ 2B3.1[5]) were 10.8% white, 33.9% black, and 52.7% Hispanic. *See* Chart of Race of Offenders in the Southern District 2006–2012 (Exhibit G).[6]

### Data pertaining to New York state-court convictions

26. According to the New York State Division of Criminal Justice Services ("DCJS"), approximately 5,000 offenders from New York City were convicted of violent-felony offenses in New York state court, every year, from 2009 until 2013. DCJS Violent Felony Offense 2013 Annual Report 2, available at http://www.criminaljustice.ny.gov/crimnet/ojsa/nys-violent-felony-offense-processing-2013.pdf. Over those five years, approximately 25,000 offenders from New York City sustained state-court convictions for violent-felony offenses. With respect to robbery in particular, in 2013 alone, 3,153 offenders from New York City sustained violent-felony robbery convictions. *Id.* at 13.

27. Data from the New York State Department of Corrections ("DOCS") shows that, as of January 2014, the population under custody (i.e., housed in a correctional facility or a DOCS-operated residential drug program) in New York State was 23.8% white, 50% African American, and 24.1% Hispanic. *See* Executive Summary, New York State Department of Corrections, *Profile of Under Custody Population as of January 1, 2014* (September 2014), available at http://www.doccs.ny.gov/Research/Reports/2014/UnderCustody_Report_2014.pdf. 45.8% of the statewide under-custody population came from New York City. *Id.*

**Conclusion**

---

[5] § 2B3.1 covers the kind of violent Hobbs Act robbery conspiracies charged in the "phony-stash cases" — 18 U.S.C. § 1951.

[6] This chart can be obtained by going to http://isb.ussc.gov/Login, selecting "Demographic Data," then selecting "Primary Offense and Offender Characteristics," then selecting "Race of Offenders in Selected Primary Sentencing Guidelines," then filtering for data from fiscal years 2006–2012 in the Southern District of New York.

28. For the reasons set forth more fully in the attached Memorandum of Law, the Court should grant the defendants' discovery motion.

Dated: New York, New York
April 21, 2015

Respectfully submitted,

/s/ *John A. Diaz*
John A. Diaz, Esq.
DIAZ & MOSKOWITZ, PLLC.
Attorney for Ernesto Colon
225 Broadway, Suite 715
New York, New York 10007
(212) 227-8208