UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

WIGBERTO VIERA, a/k/a Roberto, a/k/a
"Wiz," et al.,

                                    Defendants.

**OPINION AND ORDER**

14-cr-83 (ER)

Ramos, D.J.:

        Wigberto Viera was convicted after trial for his participation in what he believed to be

the armed robbery of drug dealers of in excess of 20 kilograms of cocaine and heroin.  In fact,

the attempted robbery was part of a "reverse sting" engineered by the Drug Enforcement

Administration ("DEA") working with a cooperating individual, Jose Rodriguez, who had

previously spent time in prison with Viera.  After three in-person meetings between, among

others, Viera and Rodriguez, which were surveilled and recorded by law enforcement, and

numerous telephone calls between Viera and Rodriguez, most of which were recorded, the

"robbery" was scheduled to take place in Manhattan on January 8, 2014.  Viera and his co-

defendants[1] were arrested when they appeared at the appointed meeting place and drove to the

location where they believed a van loaded with narcotics would be found.

        Viera was subsequently charged in an indictment with three counts:  Count One,

conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); Count Two,

conspiracy to commit Hobbs Act Robbery in violation of 18 U.S.C. § 1951; and Count Three,

---

[1] Present with Viera at the time of the robbery were co-defendants Louie Santiago, Eduardo DeJesus, Ernesto Colon and Eva Figueroa.  Santiago testified against Viera at trial pursuant to a cooperation agreement with the government. DeJesus, Colon and Figueroa also pleaded guilty but did not cooperate.

possession of a firearm during a crime of violence and narcotics trafficking offense in violation of 18 U.S.C. § 921(c)(1)(A)(i).  He was convicted after a trial, during which he interposed an entrapment defense.  On February 20, 2020, he was sentenced to 15 years imprisonment, the minimum sentence allowed by the statutes of conviction.  Specifically, he was sentenced to the mandatory minimum sentence of 10 years on Count One, 10 years on Count Two to be served concurrently with Count One, and a mandatory five-year sentence on Count Three that is required to be served consecutively to the other two counts.

Through his counsel, Viera made two post-trial motions.  First, he challenged the Court's ruling sustaining an objection by the government when defense counsel sought to impeach DEA Special Agent Todd Riley with his prior grand jury testimony that contained hearsay.  Doc. 144. Second, he argues that he is entitled to a new trial, or an evidentiary hearing, based on the post-trial disclosure by the government that Santiago, the cooperating co-defendant, purportedly told another inmate that he had committed two murders several years earlier and that on the night of his arrest with Viera, he fired shots at law enforcement officers.  Doc. 153.  Santiago, who did not tell the government about either of those offenses, denied having told the other inmate that. By Order entered on September 30, 2019, the Court denied the motions.  This opinion explains that Order.

## BACKGROUND

Jose Rodriguez testified as a cooperating witness for the government at trial, pursuant to a cooperation agreement.  Rodriguez was arrested by the DEA in 2012 and began working proactively with law enforcement shortly thereafter.  (Tr. 171:17-172:09.)  As part of his cooperation, Rodriguez told the DEA about his knowledge of Viera.  Specifically, he told them that he first met Viera when the two spent approximately nine months together in jail in 2004.

(Tr. 202:04-202:08.)  At that time, Viera told Rodriguez about his past criminal activities, including drug trafficking and armed robberies of other drug dealers.  (Tr. 201:19-202:03.)  The two also discussed engaging in criminal activities together when they got out, including robberies.  (Tr. 207:20-207:25.)   In 2009, Viera and Rodriguez spent time together again, this time in a halfway house where they coincided for approximately two months.  (Tr. at 202:09-203:10.)  The two spoke again about committing crimes together in the future.  Viera asked Rodriguez to "keep [him] in mind" for potential robberies and drug dealing.  (Tr. 203:18-204:11.)

When Rodriguez told the DEA about his previous conversations with Viera while incarcerated, they instructed Rodriguez to attempt to make contact with Viera to ascertain whether he remained interested in committing a robbery.  (Tr. 208:18-208:23.)  The DEA told Rodriguez to spend time in a certain area of Camden where Rodriguez believed Viera could be found, and Rodriguez came across Viera in that area in October 2013.  (Tr. 209:02-209:16.)  In accordance with instructions he received from the DEA, Rodriguez told Viera that he was back to selling heroin and cocaine, that he had a supplier named Mike, and that he was planning a to speak with Mike about setting up the robbery of a drug load.  (Tr. 210:12-211:05.)  During this conversation, Viera indicated that he was "ready to go" in terms of committing a robbery, and that he "ha[d] what it needs," which Rodriguez understood to mean that the defendant had access to guns.  (Tr. 221:16-221:25.)

Thereafter, Viera and Rodriguez engaged in a number of telephone calls which were recorded by Rodriguez.  (Tr. 212:05-213:02.)  During those calls, Viera assured Rodriguez of his interest in carrying out the robbery, and that he had the guns and the personnel to carry it out.  (Tr. 220:10-221:06.)  Following these phone calls, Viera and Santiago met Rodriguez in person

3

on November 15, 2013 in Manhattan in the parking lot of a McDonald's.  (Tr. 81:25-82:14.)
This meeting was surveilled and video recorded by law enforcement officers but was not audio
recorded due to an equipment malfunction.  (Tr. 92:3-92:5.)  During the course of that meeting,
Rodriguez testified that Viera expressed his continued willingness to go through with the
robbery.  (Tr. 235:06-235:08.)

After the November meeting, Viera and Rodriguez again engaged in a series of recorded
telephone calls.  As in previous conversations, Viera expressed his interest and ability to carry
out the robbery, including possessing sufficient personnel and weapons to do so.  (Tr. 238:02-
238:04; 242:15-243:06.)  The two also discussed that the purported load of drugs would contain
20 or more kilograms of cocaine and heroin.  (Tr. 244:08-245:18.)

Viera and Santiago traveled again on January 1, 2014 to the same Manhattan McDonald's
to meet with Rodriguez and Mike, who was posing as a supplier who was supposed to receive
the load of narcotics.  This meeting was video and audio recorded.  During the course of this
meeting, Rodriguez and Mike told Viera that the load would consist of approximately 22
kilograms of cocaine and five or six of heroin which, would be secreted in a trap, or secret
compartment, within a van.   Viera told them of his decision to rob the shipment directly from
the van, rather than the apartment where it was to be delivered.  (Tr. 260:02-261:13.)  Viera also
inquired whether Rodriguez and Mike had a garage to take the van to after the robbery, where
they could extract and divvy up the drugs after the robbery.  (Tr. 257:05-257:10.)

Following the January 1 meeting, Viera and Rodriguez had another series of phone
conversations that were recorded by Rodriguez.  In these calls, among other things, Viera told
Rodriguez that he and his crew were ready and that he was "anxious" for the robbery to take

4

place so that he could get paid.  (Tr. 270:15-271:07.)  On the day before the planned robbery,

Viera reminded Rodriguez to arrange for a garage. (Tr. 272:02-272:03.)

The robbery was planned for January 8, 2014.  Cooperating witness Santiago testified

that the five co-conspirators met that morning in Viera's house.  (Tr. 499:17-499:24.)  At the

meeting, Viera discussed what role the members would play in the robbery, including what

weapons would be used.  (Tr. 503:24-504:18.)  It was decided that they would use an AK-47 that

Viera had at his house as well as two other guns.  (Tr.501:09-501:14.)  Santiago drove Viera,

Colon and DeJesus to retrieve a shotgun from someone else's house, and Santiago and Viera

retrieved a handgun from a third person.  (Tr. 502:16-503:12.)  Santiago also accompanied Viera

to buy zip ties.

That day, Viera met with Rodriguez twice.  (Tr. 272:14.)  The first meeting took place at

the same McDonald's parking lot in Manhattan where they had previously met and included

Viera, Santiago and Rodriguez.  (Tr. 273:06-273:08.)  At that meeting, Rodriguez confirmed that

the robbery was still on.  (Tr. 273:19-273:23.)  Rodriguez also gave them a key to a hotel room

where Viera and his co-conspirators could wait until the time of the robbery.  (Tr. 274:02-

274:07.)  In the evening, Rodriguez called Viera and told him to return to the McDonald's

parking lot.  (Tr. at 274:16-274:17.)  Viera returned with Santiago, DeJesus, Colon and Figueroa,

but he exited the car alone to meet with Rodriguez and Mike.  (Tr. 275:07-275:20.)

During this final meeting, it was Viera who decided how the drugs would be split

between he and his crew, and Rodriguez.  (Tr. 279:20-279:21.)  Rodriguez told Viera that there

would be two drug dealers in the van and they would be armed, and Viera responded, "I got

something big for them there. I'll calm them down right away."  (Tr. 280:22-280:15.)  Rodriguez

understood Viera to be referring to the weapons he and his co-conspirators had brought.  (Tr.

281:02-281:05.)  Viera also told them how he intended to carry out the robbery:  "We arrive . . . .
When they come, we're going to roll up on them.  When they park, bam, the girl already – she'll
have the doors open . . . .  When you see I get inside the van to leave, bam, take off.  I'll be right
behind you . . . "  (Tr. 281:15-282:10.)

At that point, Rodriguez and Mike drove toward the location of the purported robbery in
one car with Viera and his co-conspirators following in another.  (Tr. 300:01-300:04.)  Law
enforcement stopped the vehicle with the robbery crew, and Rodriguez and Mike drove away.
(Tr. 302:20-303:01.)  During the course of the stop and arrest, Santiago was shot in the arm.  (Tr.
518:23-519:18.)  Recovered from the vehicle in which the robbery crew was driving were ski
masks, gloves, zip ties, a .40-caliber Taurus handgun, an AK-47, and a 12-gauge shotgun with a
pistol grip.  (Tr. 48:1-48:4.)  All three firearms were loaded at the time they were recovered,
including the .40 caliber handgun, which had a bullet in the chamber.  (Tr. 50:5-51:25.)

After Viera was arrested, he provided a post-arrest statement to Special Agent Riley in
which he admitted that he had come to New York that day to rob a shipment of cocaine with
someone with whom he had previously been imprisoned.  (Tr. 118:02-118:06.)

*Special Agent Riley's testimony*.

As relevant to the instant motions, during cross-examination of Special Agent Riley,
defense counsel asked him whether he had seen Santiago point a handgun when he exited the
vehicle.  (Tr. 158-59.)  Agent Riley replied that he had not.  Defense counsel then sought to
impeach that answer by reference to Agent Riley's testimony before the grand jury that at the
time of the arrest, Santiago got out of the car and pointed a gun at law enforcement.  Doc. 144 at
2.  The government objected and the Court sustained the objection on the basis that Riley's

testimony before the grand jury, which relied in part on hearsay, did not require him to have actually witnessed Santiago point a gun for the statement to be truthful.  (Tr. 161-62.)

*Santiago's trial testimony*.

At trial, in addition to testifying about his involvement in the instant offense as described above, Santiago also testified, and was cross-examined extensively about, his own criminal history.  Specifically, he testified that he was convicted of aggravated assault in 2000 or 2001 (Tr. 446:23-447:11); that approximately two years later, was convicted of a crime for eluding the police on a motorcycle (Tr. 447:12-447:19); that in 2004 or 2005, he was convicted of distributing heroin near a school zone (Tr. 447:20-448:01);  and that he was convicted, several years later, of possessing a gun.  (Tr. 448:02-448:11.)

Santiago also told the jury about crimes he committed but for which he had never been caught.  Specifically, Santiago testified about fights he had as a child and assaults he committed as an adult. (Tr. 452:04-452:17.)  He also admitted to having participated in a conspiracy to distribute heroin over a period of approximately six years.  (Tr. 449:19-450:04.)  He also testified that he once fired a gun at a moving car that he believed was carrying rival drug dealers.  (Tr. 450:23-451:22.)  The shot struck the car but did not injure any person in the car.  (Tr. 451:23-452:03.)  Finally, Santiago testified about his membership in the Latin Kings, an Hispanic gang. (Tr. 450:02-450:08; 451:14-451:20; 452:08-453:04.)  He told the jury that he rose within the gang to be the head of the Camden chapter.  (Tr. 453:11-453:19.)  He was later banned from the gang in 2010 for refusing to follow an order directing him to assault a fellow prisoner while incarcerated.  (Tr. 454:10-454:24.)

*Post-trial developments*.

As reported by the government, on October 19, 2015, after the trial of this case, an individual incarcerated with Santiago ("Individual-1"), met with the government in hopes of obtaining a cooperation agreement in connection with his, unrelated, case.  Doc. 153 at 22.  At that meeting, Individual-1 told the government that he met Santiago in August 2015, after the trial in this case, and that over the course of several conversations, Santiago admitted to him that Santiago had shot and killed two people, one in 2007 and one in 2013, related to a dispute over Santiago's father's drug business.  *Id.* at 23.  As relevant to the instant motion, Individual-1 also told the government that Santiago told him that when he was being arrested in connection with this case, Santiago believed that he and his co-conspirators were being robbed and that he fired shots before being shot in the arm by a DEA agent.  *Id.*

In an October 22, 2015 meeting with the government, Santiago denied that he told Individual-1 that he had murdered anyone or telling him that he fired shots at law enforcement during his arrest in this case.  *Id.* at 24.

*Post-trial motions*.

Viera, through his counsel,[2] made two motions pursuant to Federal Rule of Criminal Procedure 33.  First, he challenged the Court's ruling precluding defense counsel from impeaching Agent Riley with his prior grand jury testimony that contained hearsay.  Doc. 144.  Second, he argues that he is entitled to a new trial, or an evidentiary hearing, based on the post-trial disclosure by the government that Santiago purportedly told Individual-1 that he had

---

[2] Viera separately filed his own, *pro se*, motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  Doc. 167.  In that motion, Viera primarily argues that the Court either did not instruct the jury on entrapment or that its instruction was deficient.  However, the Court did instruct the jury on entrapment (Tr. 724:17-727:10), and Viera does not indicate in which way the charge was deficient.  To the extent that Viera argues that the use of a "reverse sting" by law enforcement in this case is itself entrapment, the Court rejected that argument prior to trial in response to his motion to dismiss the indictment on the basis of outrageous governmental misconduct.  *See United States v. Viera*, 2015 WL 171848, at *3-*5 (S.D.N.Y. Jan. 14, 2015)

committed two murders several years earlier and that on the night of his arrest with Viera, he fired shots at law enforcement officers.  Doc. 153.

## DISCUSSION

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty,* 562 F.3d 458, 475 (2d Cir.2009) (quoting *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001), and *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992)).  The Second Circuit has observed that to order a new trial under Rule 33, courts must be satisfied that "it would be a manifest injustice to let the guilty verdict stand." *Sanchez,* 969 F.2d at 1414 (quoting *United States v. Reed,* 875 F.2d 107, 114 (7th Cir.1989)).  In evaluating a Rule 33 motion, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether the defendant has met these onerous burdens. *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001).  Ultimately, "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  *United States v. Torres,* 128 F.3d 38, 48 (2d Cir.1997) (quoting *United States v. Moore,* 54 F.3d 92, 99 (2d Cir.1995)).

In order for such a motion to have merit, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted."  *Sanchez*, 969 F.2d at 1413.  A new trial should not be granted when the court is "'satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict.'"  *United States* v. *Henry*, No. 13 Cr. 91, 2015 WL 861743, at *2 (E.D.N.Y. Feb. 27, 2015) (quoting *Ferguson*, 246 F.3d at 134).

The Second Circuit has "frequently acknowledged that, even where newly discovered evidence indicates perjury," a Rule 33 motion "should be granted only with great caution and in the most extraordinary circumstances."  *United States* v. *Stewart*, 433 F.3d 273, 296-97 (2d Cir. 2006) (quotation marks omitted).  Even if a witness has committed perjury, "if the prosecution was not aware of the perjury [at the time of trial], a defendant can obtain a new trial only where the false testimony leads to a 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  *Stewart*, 433 F.3d at 296-97 (quoting *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

Courts are especially reluctant to grant a new trial where the newly discovered evidence underlying a Rule 33 motion would function solely as additional impeachment material.  "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal."  *United States* v. *Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (quotation marks omitted); *see also, e.g.*, *United States* v. *Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.") (quotation marks omitted).

_Limited preclusion of the cross-examination of Agent Riley was not error_.

Viera contends that he should have been allowed to cross-examine Agent Riley on the purportedly inconsistent testimony he provided to the grand jury and the trial jury. Specifically, before the grand jury, in response to the question "what happened" during the arrest, Agent Riley, relying in part on hearsay, testified that Santiago had pointed a gun at law enforcement. During cross-examination at trial, testifying only as to what he personally observed, Agent Riley testified that he had not seen Santiago point a gun at law enforcement. The government objected to the proposed cross-examination on the basis that the testimony was not contradictory and that any effort to explain to the trial jury why it was appropriate for Agent Riley to testify in the way that he did would be confusing and cause undue delay. The Court agreed and sustained the objection. The Court's ruling was not error, and, even if it were, it would not remotely form the basis for a new trial.

First, it was, of course, perfectly appropriate for Agent Riley to have relied on hearsay when testifying before the grand jury. Indeed, Special Agent Riley specifically told the grand jury that his testimony was based in part on information provided to him by fellow law enforcement officers, rather than solely on his personal observations. (Docket No. 144-1 ("GJ Tr.") 03:10-03:19.) The government also specifically instructed the grand jury that Agent Riley's testimony may be based partly on hearsay. (GJ Tr. 03:20-04:04.) Agent Riley was therefore permitted to tell the grand jury what he heard from others. There was thus no reason to believe that his testimony at trial that he did not personally see Santiago pointing a gun was contradictory to what he told to the grand jury.

Secondly, "[a] district court has 'wide latitude' in setting the scope of cross-examination, based on concerns for the potential for harassment, prejudice, confusion of issues, repetition, and

irrelevance." *United States v. Speight*, 75 F. App'x 802, 806 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  The Court was therefore within its rights to limit cross-examination on this issue as it would have required a detour from the trial in order to explain to the jury the different evidentiary rules applicable to a federal grand jury versus a petit jury.

Even if the Court's ruling limiting cross-examination was error, it would not be a basis for granting a new trial.  As noted above, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134, when taking into account "all facts and circumstances" of the "entire case," *id*.  Here, the government's case was exceedingly strong.  The trial evidence included numerous recorded conversations and surveillance of in-person meetings involving Viera, Santiago and Rodriguez as they planned the robbery, as well as Viera's presence at the time and place of the purported robbery with a crew of four other people, three loaded weapons, ski masks and zip ties.  It is inconceivable that, even if Agent Riley had been effectively discredited with respect to that portion of his testimony, the outcome would have been different.  Moreover, as the government points out, "given the defendant's stated aim of showing that the defendant and Santiago were 'outclassed petty criminals,' and not 'dangerous professionals,' it is not clear how introducing grand jury testimony suggesting that Santiago pointed a gun at law enforcement would have aided the entrapment defense at all."  Doc. 153 at 28.

The cases Viera relies on do not counsel a different result. While they do stand for the proposition that courts should ensure that criminal defendants have a robust opportunity to test the credibility of those who testify against them, they also emphasize the ability of courts to place reasonable limits on cross-examination, and subject a court's exercise of discretion to

harmless error analysis.  *See, e.g. U.S. v. Treacy*, 639 F.3d 32, 45 (2d Cir. 2011) ("However, [e]ven if we conclude that the trial judge has improperly curtailed cross-examination in violation of the defendant's confrontation rights, we are not to reverse automatically but are to apply harmless-error analysis, in order to determine whether, assuming that the damaging potential of the cross-examination were fully realized, the error was harmless beyond a reasonable doubt.") (internal citations and quotation marks omitted)); see also, *U.S. v. Cedeno*, 644 F.3d 79 (2d Cir. 2011) (holding that, while the court erred in limiting the cross-examination of police witness, a new trial was not required because the error was harmless).

In sum, the Court has no concern that by limiting the ability of defense counsel to cross examine Agent Riley, "an innocent person may have been convicted.  *Sanchez*, 969 F.2d at 113.

### The post-trial disclosures regarding Santiago do not merit a new trial.

Viera argues that the information provided by Individual-1 about Santiago at the very least suggests that Santiago perjured himself at trial concerning the extent of his criminal history and his actions surrounding his arrest, and that they are sufficiently serious so as to infect the entirety of his testimony.  While the allegations concerning his criminal history and violent actions at the time of arrest are certainly serious, the Court concludes that, even if true, a new trial is not warranted.

As a preliminary matter, the revelations concerning Santiago constitute newly discovered evidence and therefore, even where it indicates perjury, such evidence would warrant a new trial only "in the most extraordinary circumstances."  *Stewart*, 433 F.3d at 296-97.  So long as the government was not aware of the perjury at the time of trial, and there is no suggestion here that they were, "a defendant can obtain a new trial only where the false testimony leads to a 'firm belief that but for the perjured testimony, the defendant would most likely not have been

convicted.'" *Stewart*, 433 F.3d at 296-97 (quoting *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

Here, even without Santiago's testimony, the government's case was strong.  In particular, because Viera argues that that his entrapment defense would likely have prevailed if the information from Individual-1 had been placed before the jury, the Court notes that nothing in the recorded conversations presented at trial suggested that Viera was in any way hesitant about going forward with the robbery.  To the contrary, Viera repeatedly asserted his willingness, indeed, his desire to move forward.  As highlighted by the government, Viera told Rodriguez on these recordings that he had the tools prepared to do the job (Tr. 216:04-220:03); that he had the people for the job (Tr. 227:02-227:12); that he planned to explain to Rodriguez and Mike how the robbery would be carried out (Tr. 242:02-242:14); and that the robbery would be a party for "grown-ups" (Tr. 270:15-271:07).  Viera also asked Rodriguez about the quality of the drugs (Tr.250:03); insisted taking the van to a garage so that they could extract the drugs from the van in seclusion rather than on the street (Tr. 254:23-255:07); and stating, in anticipation of the planned robbery, "I'm fucking anxious.  I want to hurry up.  I want to get paid." (Tr. 270:20-270:21.)  The foregoing statements were made completely independently of Santiago and persuasively show that Viera was predisposed to carrying out the robbery, thereby defeating the entrapment defense.

To be sure, the recorded conversations were not the only evidence Viera's predisposition to move forward with the robbery.  Agent Riley also testified that when he first instructed Rodriguez to make the approach, he told him not to push if Viera expressed any hesitation.  (Tr. 68:10- 68:13.)  Rodriguez also testified that while he and Viera were incarcerated together, Viera

discussed with him prior robberies and his willingness to conduct future robberies with Rodriguez.  (Tr. 201:19-202:3; 203:18-207:04.)

Finally, because the information provided by Individual-1 does not go to the core of the case against Viera, it would simply constitute additional impeachment material that could be used to discredit Santiago.  Thus, it would not serve as a basis to grant a new trial.  *United States* v. *Forbes*, 790 F.3d at 406-07 (holding that "[r]elief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal.");  *see also, e.g.*, *United States* v. *Wong*, 78 F.3d at 79 ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.") (quotation marks omitted).

## CONCLUSION

For the reasons set forth above, Viera's motions are DENIED.

It is SO ORDERED.

Dated:    April 8, 2021
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.